## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

LARRY LEE LEMAY,                    )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )        Case No. CIV-07-401-HE
                                    )
BILL WINCHESTER, et al.,            )
                                    )
            Defendants.             )

## REPORT AND RECOMMENDATION

Plaintiff, a state prisoner appearing pro se, brings this action pursuant to 42 U.S.C. §

1983 alleging various violations of his constitutional rights.  Pursuant to an order by United

States District Judge Joe Heaton, the matter has been referred to the undersigned Magistrate

Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).  Before the Court are

two motions for summary judgment: one by Defendants Johnson and Taylor, and one by

Defendant Winchester. Plaintiff has filed a response to both motions, and the movants have

filed replies. In addition, Plaintiff has filed three sur-replies and a supplemental sur-reply.[1]

---

[1]Defendants Johnson and Winchester have filed a motion to strike Plaintiff's sur-replies and supplemental sur-reply. [Doc. No. 150, regarding Doc. Nos. 146, 147, 148, and 149].  Although sur-replies are not allowed as a matter of course, the undersigned has found the material helpful and so the content of these additional and supplemental replies has been considered.  Accordingly, the motion to strike [Doc. No. 150] is hereby denied.  However, Plaintiff's Motion to Enter Further Documentary Evidence Into the Record is hereby denied. [Doc. No. 151].  Thereby, Plaintiff offers materials regarding the treatment of diabetes in a correctional setting from the Prison Legal News and the American Diabetes Association. The materials are not properly authenticated, were offered long after the motions under consideration were at issue, and in any event, the materials are not necessary to a determination of the issues raised in the motions for summary judgment. This moots the Defendants' motion to strike [Doc. No. 152].

Thus, the matters are at issue and ready for disposition. For the following reasons, it is recommended that the motions for summary judgment of Defendants Johnson and Winchester be granted in part and denied in part, and that the motion for summary judgment of Defendant Taylor be granted.

Plaintiff is an Oklahoma state prisoner currently housed at the Dick Conner Correctional Center in Hominy, Oklahoma, but at all times relevant to this action, was housed at the Garfield County Detention Facility (GCDF) in Enid, Oklahoma. In the First Amended Complaint,[2] Plaintiff names three Defendants, whom he identifies as follows: Bill Winchester, Sheriff of Garfield County; Misty Taylor, GCDF administrator; and Kim Johnson, registered nurse at GCDF.[3]

Plaintiff's eight-count complaint[4] centers on the medical care he received for his diabetes while incarcerated at the GCDF on two separate occasions: once beginning on October 11, 2005, through February 16, 2006, as a pre-trial detainee, and again on three occasions in 2007 as a state prisoner who was returned to the facility for a court hearing. He alleges violations of the Eighth and Fourteenth Amendments, as well as two Oklahoma

---

[2]Plaintiff filed a motion to file a Second Amended Complaint, in which he sought to add five additional Defendants, among other things. That motion was denied on June 5, 2008. [Doc. No. 98].

[3]The motion to dismiss of three other Defendants, Steve Hobson, Garfield County Commissioner; Michael J. Postier, Garfield County Commissioner; and Scott Savage, Garfield County Commissioner was granted and they are no longer parties to this action. [Doc. Nos. 102, 135].

[4]Although there are nine numbered counts, there is no count five.

statutes concerning standards for treatment of inmates incarcerated in county jails.[5]

In Count I, he alleges that his rights under the Fourteenth Amendment were violated due to deliberate indifference to his medical needs.  First Amended Complaint, p. 8.  More specifically, he alleges that although he completed a medical questionnaire upon booking into the GCDF in October 2005 indicating that he was on a doctor prescribed medical diet, a regular diet high in sugars was served everyday.  Id. at 9.  He alleges that his request for daily checks of his blood sugar were denied.  Id.  He alleges that these requests were made to Defendants Johnson and Taylor.  Id.  He alleges that on January 5, 2006, he notified jail staff that he was dizzy, weak, thirsty, and had a rapid heartbeat.  Id.  He claims that his condition worsened over the course of the day, and that requests by he and his cellmate for assistance went without response.  Id.  He claims that assistant jail administrator Randy Coleman checked on him later, and that he was then having periods of unconsciousness. Id. at 9-10. He states that he was informed at that time that Defendant Johnson, the facility nurse, was not there.  Id. at 10. He claims that at around 11 a.m., he was lying on the floor, vomiting, and could hardly stand or walk.  Id.  He alleges that jail staff seemed not to care or know what to do.  Id.  He alleges that around 4:30 p.m., he was taken to the medical department to see the nurse for assessment.  Id.  He alleges that she found his blood sugar to be high and his nail beds blue, and that he informed her that he was in Diabetic Keto-Acidosis (DKA) Id.  He claims that Defendant Johnson did not test for ketones, and instead placed him in a

_____

[5]He also lists the Americans with Disabilities Act in the jurisdictional portion of the First Amended Complaint, see id. at 6, but  makes no specific allegations regarding it.

3

cell outside the medical department and encouraged him to eat a regular food tray that contained sugar-sweetened applesauce.  Id.  He further alleges that staff received orders at around 6 p.m. to send him to the hospital, and that he was then admitted to the intensive care unit due to DKA.  Id. at 11.  He alleges that upon his release from the hospital seven days later, he was discharged with orders for a diabetic diet that was not followed by GCDF.  Id. He also claims that following his release, he still did not receive blood sugar tests as requested.  Id.  Finally, he alleges that Defendant Taylor was aware that his diabetes was not being attended to properly, and yet failed to take appropriate action to resolve the problem. Id.

In Count II, he alleges that his Eighth Amendment rights were violated during his 2007 incarcerations at GCDF due to a failure to provide a medically required diabetic diet. Id. He alleges that although a staff member told him that Defendant Johnson would speak to him about his medical problems, that this was never done; he further claims that he was not given a medical questionnaire to complete, and was not placed on a diabetic diet that he had been receiving through doctor's orders from the Oklahoma Department of Corrections (ODOC).  Id. at 12.  He alleges that he was served a regular menu high in sugars, and that on March 12, 2007, he was feeling dehydrated and thirsty; he claims that a blood sugar test at that time showed an elevated level of 521 mg.  Id.   He claims that although his blood sugar was to be re-tested in two hours, it was not.  Id.  He alleges that he informed the shift supervisor at about 6:30 p.m. that he was still feeling sick, and she stated that no one had informed her of his high blood sugar or the need to re-test it.  Id.  He claims that his blood

4

sugar was tested at 8:30 p.m., and was still high.  He claims that Defendant Johnson was deliberately indifferent to his medical needs, as shown by her failure to attend to his medical care and her failure to inform the next shift about his high blood sugar and the need to re-test it.  Id.

In Count III, Plaintiff alleges that Defendant Winchester violated his Fourteenth Amendment rights in that he was aware that Plaintiff had failed to receive adequate medical care during a previous incarceration at GCDF in 2004.  First Amended Complaint, p. 13.  He alleges that "inmate notes" during this period showed he was having problems receiving prescribed insulin doses, and that the facility nurse did not respond to pages regarding his high blood sugar.  Id. He claims that he was transported to the hospital emergency room, where it was noted by a doctor that Plaintiff's blood sugar was high due to his failure to receive blood sugar tests and sliding scale insulin doses.  Id.  He claims that problems regarding the medical staff failing to respond to his medical complaints and needs were documented, and were a longstanding problem that has yet to be resolved by Defendant Winchester.  Id.

In Count IV, he alleges that a 2003 report by the United States Department of Justice found that the GCDF was understaffed and subjected inmates to a risk of serious harm, and that the facility nurse was operating beyond her scope and did not follow protocols and procedures.  Id. at 14.  He claims that Defendant Winchester received a copy of this report, but that the problems were not resolved demonstrating deliberate indifference to Plaintiff's serious medical needs.  Id.

In Count VI[6], he alleges that the deliberate indifference to his medical needs caused suffering and abdominal pain up to and through the period of his January 5, 2006, hospitalization.  First Amended Complaint, p. 14.

In Count VII and VIII, Plaintiff alleges that Defendant Winchester violated Oklahoma statutes requiring that inmates be provided adequate medical care and diet.  Id. at 15.

In Count IX[7], Plaintiff alleges that Defendant Johnson showed deliberate indifference to his serious medical needs by failing to perform a urinalysis for ketones after he informed her that he believed he was in DKA, encouraging him to eat even after his blood sugar tested high, and taking all day to return to the facility although she had been notified of his illness by jail staff.  Id. at 15-16.

# I. PROCEDURAL HISTORY

Petitioner instituted this action on April 5, 2007, against Defendants Winchester and Taylor. [Doc. No. 1].  He amended his complaint on February 13, 2008, to add Kim Johnson and Garfield County Commissioners Steve Hobson, Michael Postier, and Scott Savage. [Doc. No. 54].   Defendant Johnson filed a motion to dismiss the amended complaint, as did Defendants Hobson, Postier, and Savage. [Doc. Nos. 85, 87].

It was recommended that Defendant Johnson's motion to dismiss be granted with

---

[6]The First Amended Complaint contains no Count V.

[7]Plaintiff denominates this count as "Count IV," but because  his First Amended Complaint contains another count numbered IV, and this count follows Count VIII, a typographical error has been assumed.

regard to Plaintiff's state law and § 1983 claims against her for his 2005-06 incarceration in the GCDF because they were untimely. [Doc. No. 102].   It was alternatively recommended that Plaintiff's state tort claims against Defendant Johnson with regard to the 2005-06 incarceration be dismissed because she was acting within the scope of her employment and thus, she was not a proper Defendant under the Governmental Tort Claims Act (GTCA). Id. It was recommended that Defendant Johnson's  motion be denied with regard to Plaintiff's state law claims related to his 2007 incarceration because (1) under the appropriate standard his allegations were sufficient to state a claim that Defendant Johnson acted outside the scope of her employment, making her a proper Defendant; and (2) the claim was timely under Oklahoma's general tort statute of limitations. [Doc. No. 102].

With regard to the motion to dismiss of the County Commissioner Defendants, Hobson, Postier, and Savage, the undersigned recommended dismissal because Plaintiff failed to allege that they acted outside the scope of their employment, making them improper defendants under the GTCA. [Doc. No. 102].   Furthermore, the undersigned found that Plaintiff had failed to allege that he had complied with the notice and limitation provisions of the Act - an essential element and condition precedent to an claim under the GTCA - entitling the County Commissioner Defendants to dismissal in their official capacities as well. [Doc. No. 102]. Finally, the undersigned found that the County Commissioner Defendants were entitled to dismissal of Plaintiff's claims under § 1983 because he failed to allege that they personally participated in the alleged constitutional violations.  Id.

The Report and Recommendation was adopted by Judge Heaton on November 26,

7

2008. [Doc. No. 135].  Accordingly, Defendants Hobson, Savage, and Postier have now been dismissed from the action, and the only claims remaining against Defendant Johnson are Plaintiff's state law and federal civil rights claims related to his 2007 incarceration. Currently before the Court is the joint motion for summary judgment of Defendants Taylor and Johnson, and the motion for summary judgment of Defendant Winchester.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only where the pleadings and any supporting documentary materials "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party.  Calhoun v. Gaines, 982 F.2d 1470, 1472 (10th Cir. 1992); Manders v. Oklahoma, 875 F.2d 263, 264 (10th Cir. 1989).  A dispute is "genuine," when viewed in this light, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986).  "Material facts" are "facts that might affect the outcome of the suit under the governing law."  Id.

To obtain summary judgment, the moving party need not affirmatively negate the nonmovant's claims.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Rather, the moving party initially bears the burden only of " 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Id., at 325.  Once the moving party has satisfied this burden, the burden shifts to the

nonmoving party to show that there is a genuine issue of material fact.  Id. at 324. The nonmoving party "may not rest upon mere allegation" in his pleading to satisfy this requirement  Anderson, 477 U.S. at 256.  Rather,  Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324.

## III.  UNDISPUTED FACTS

Based upon the special report, the first amended complaint, and the evidentiary material appended to the various motions and responses filed herein, the following material facts are uncontroverted, deemed admitted, or, where disputed, viewed in the light most favorable to Plaintiff.  Immaterial facts and facts not properly supported by the record are omitted.

Plaintiff was diagnosed with Type I diabetes in approximately November 1990. Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 12, l. 2-5). Plaintiff testified that his blood sugar normally ranges from 115 mg to 200-300 mg. Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 19). According to the website of the American Diabetes Association, the normal range of blood sugar before a meal is between 70-130, and less than 180 after a meal.  American Diabetes Assoc,Checking Your Blood Glucose, http://www.diabetes.org/type-1-diabetes/blood-glucose-checks.jsp (accessed April 14, 2009). Plaintiff states that he has always had difficulty keeping his blood sugar level under control, including during a previous

incarceration at a facility in Nashville, Tennessee. Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 17, 19).

On October 11, 2005, Plaintiff was arrested and placed in the Garfield County Detention Facility, and he remained in custody there until February 16, 2006. Id. at p. 15. The Garfield County Detention Facility Nurse Health Questionnaire completed by Plaintiff at that time indicated that he had insulin dependent diabetes, and was on a doctor prescribed diet for diabetes. Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment, Ex. 20. Defendant Johnson admits that when Plaintiff was booked into the jail on October 11, 2005, Plaintiff was on a diabetic diet, and that although he provided the name and telephone number of his doctor, that doctor was never contacted regarding Plaintiff's condition. Defendant Kim Johnson's Amended Responses to Plaintiff's Third Request for Admissions, Response No. 1 (attached to Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment). [Doc. No. 140-9, p. 20-21] Defendant Johnson consulted with physician's assistant Dave Harrison, P.A.C., who she states did not believe it was necessary to contact Plaintiff's doctor as Plaintiff could be treated "based on the information we had." Id.

Plaintiff was never served a diabetic or any other type of special diet at any time during his incarcerations in the Garfield County Detention Facility. Defendant Misty Taylor's Responses to Plaintiff's Third Request for Admissions, Response No. 5 (attached to Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment). [Doc. No. 140-13]. According to Plaintiff, the normal jail diet included items such as rice and

oatmeal sprinkled with sugar, pancakes with syrup, and peanut butter and jelly sandwiches. Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 33-34).

During Plaintiff's incarceration from October 2005 to February 2006, he was allowed to and did purchase sweets from the jail commissary. Special Report, Ex. 3. From October 17, 2005 to February 13, 2006, Plaintiff purchased over 360 snack items from the commissary, such as candy bars, cookies, cherry and fruit punch drink mixes, and cocoa. Id. He testified that he ate some, but not all, of these items as inmates stole some of the items from his cell. Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 25). Plaintiff made no commissary purchases during his 2007 incarcerations at the jail. Defendant Misty Taylor's Responses to Plaintiff's Third Request for Admissions, Response No. 1 (attached to Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment). [Doc. No. 140-13]. On three separate occasions, jail staff discussed with Plaintiff their concerns regarding the effect of the sweets ordered from the commissary on his diabetic condition. Special Report, Ex. 2.

On November 22, 2005, Plaintiff filed a grievance report form stating that he had requested a blood sugar test from a jail employee because he felt as if it were high, and buzzed jail personnel for assistance after two more hours passed with no test. Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment, Ex. 3. [Doc. No. 140-13, p. 15]. He stated in his grievance that his blood sugar was never tested that day, and he requested that "each shift would please check [his] blood sugar at least 1 time." Id. In

11

response, Defendant Taylor stated that she spoke to the employee in question and "he apologizes." Id.   On December 13, 2005, Plaintiff filed a grievance stating that on December 11, 2005, he had told the jailer that his insulin pump was low. Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment. [Doc. No. 140-13, p. 14].  The jailer asked if it could wait until the next morning, and Plaintiff stated that it could, but that the pump was not filled. Id.  His blood sugar was high when tested the next evening. Id.  In his response to the grievance, assistant jail administrator Randy Coleman stated "I believe this has been resolved." Id.

During his incarceration in the latter part of 2005, Petitioner's blood sugar was not consistently checked on a daily basis.  Special Report, Ex. 1.  On seven different occasions, there were times when Plaintiff went anywhere from two to four days between blood sugar tests: October 29-30, 2005; November 3-5, 2005; November 9-11, 2005; November 15-16, 2005; November 27-29; December 7, 2005; December 10, 2005; December 16-18, 2005; December 24, 2005; December 28, 2005.  Id.

At about 7 p.m. on January 4, 2006, Plaintiff requested a refill of his insulin pump which was running low.  Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 42-44). Plaintiff testified that there was only enough insulin in the pump to last about two hours.  Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 42).  Plaintiff was normally escorted from his cell to the medical area to refill the pump. Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 40-41). However, on this occasion he was not allowed by a jail

employee to refill it because it was against jail policy to let inmates out of their cells at night. Id.  Plaintiff awoke around 4 a.m on January 5, feeling that his blood sugar was high; his insulin pump was empty. Id. at p. 42.  His insulin pump was refilled at about 7:00 a.m. when medications were passed out by jail staff. Id. at 43.  His blood sugar was also tested at that time and was 465. Id.; Special Report, Ex. 2, p. 3.  An inmate note[8] states that on January 5, "the tower called and advised that [inmate] Lemay was still dizzy and not feeling well." Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment, Ex. 7. [Doc. No. 140-13, p. 5]. The report also states that Plaintiff had blood shot eyes and that he reported trouble breathing. Id.  It states that Randy Coleman was advised of the situation, and the nurse, Defendant Johnson, was paged. Id.  When Defendant Johnson called back, she told them to do a "fingerstick," which was done and the results were 465. Id.  The Defendant Johnson was advised of the "fingerstick" results and she then advised that "we" needed to make sure that Plaintiff took his insulin. Id.  Ten to fifteen minutes later, Plaintiff's blood sugar was 417, and at 11 a.m. was 461. Id.  The amount of insulin that had been dispensed was checked, and corresponded with what Plaintiff had told jail staff regarding the amount of insulin he had received. Id.  Randy Coleman assisted jail personnel in verifying that Plaintiff was accurately reporting the amount of insulin he had used, and also advised "that he needed to quit eating all the junk food and start eating better and we wouldn't be having this problem." Id.

---

[8]The inmate note bears a "Report Date/Time"of March 20, 2007, but shows entries for November 21, 2005, and January 5, 2006.

When Plaintiff's insulin pump was refilled at around 7 a.m. on January 5, 2006, he believes he was already in diabetic ketoacidosis (DKA).[9]  Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 47).  He was having stomach pain, dizziness, nausea, frequent urination, and thirst.  Id.  By 9 a.m. Plaintiff was lying on his bunk having periods of unconsciousness.  Id. at 49.  Defendant Johnson's notes show that she received several pages that day, that she was "out of county," and advised jail staff that she would see Plaintiff when she returned.  Special Report, Ex. 2, p. 3.  Defendant Taylor and Johnson were both in Oklahoma City on January 5, 2006.  Id. at 4.   Defendant Johnson's progress notes indicate that Plaintiff possessed several packages of cookies, candy, and other items, and he was advised not to consume them "[at] this time."  Id.

At about 4 or 4:30 p.m.,  Plaintiff was taken to the medical department where Defendant Johnson examined him.  Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p.54-55).  Defendant Johnson's notes indicate that she was advised upon her return that Plaintiff had remained stable, that he was "just not feeling good- eyes bloodshot - Overall, inmate appeared okay per staff- did state [inmate] had [nausea/vomiting]." Special Report, Ex. 2, p. 4.  Upon her examination, Defendant Johnson found Plaintiff to have very red eyes, jaundiced face color, cyanotic nail beds, and "hi" blood sugar.  Id.  She contacted physician's assistant D. Harrison, and received orders to administer

---

[9]DKA is a serious condition in which high blood sugar causes a lowered pH level abnormal electrolytes, and can lead to coma and death. Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment, Ex. 10, p. 15 (deposition of Samantha C. Moery, D.O.).

more insulin and recheck Plaintiff's blood sugar in 30 minutes.  Id.  Plaintiff was given water and "kept in booking for cont. monitoring."  Id.  Upon recheck, she reported that his blood sugar was still "hi," that Plaintiff was "not feeling worse - slightly better."  Id.  She notified physician's assistant Harrison, and received an order to send Plaintiff to the emergency room. Id.  Physician's assistant Harrison later reported that Plaintiff's blood sugar was running in excess of 500, and that he would be admitted to the hospital.  Id. at 5.  Defendant Johnson also states that Defendant Winchester was notified.  Id.  Plaintiff remained at the hospital for seven days.  Id. at 6.   The discharge instructions included a diabetic diet.  Plaintiff's Objection to Defendant Johnson's Motion for Summary Judgment, Ex. 1 [Doc. No. 139-2].

Defendant Johnson's notes indicate that she spoke to Dr. Moery on the day of discharge about the discharge orders and that they "discussed ADA 2000 cal diet - received orders to follow current 'jail' menu and it will be up to D. Harrison PAC to adjust as needed."  Special Report, Ex. 2, p. 6.  At her deposition, Dr. Moery could not recall this conversation; she further testified that she did not know what constituted a "jail" menu. Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment,  Ex. 10 (Deposition of Samantha Moery, D.O., p. 24, 32-33).

Five days after he returned to the Garfield County Detention Facility, Defendant Johnson's notes indicate that Plaintiff's insulin pump had not been changed and was still three quarters full.  Special Report, Ex. 2, p.  6.  Because Dr. Moery advised that the insulin vial should only last a little over two days, Defendant Johnson contacted physician's assistant D. Harrison who she noted "feels [inmate] is not using pump correctly - is messing with it."

Id. at 6-7.  At that time, Harrison directed that the insulin pump be monitored, but that it would probably be discontinued and insulin instead be administered by injection.  Id.  On January 19, 2006, Defendant Johnson noted that staff had reported Plaintiff buying sugary items from the commissary.  Id. at 7.  Plaintiff was called to medical services where Defendant Johnson and Randy Coleman spoke to him about purchasing sweets and not properly administering insulin.  Id.  Following that conversation, physician's assistant D. Harrison ordered discontinuation of the insulin pump and administration of insulin by injection.  Id. at 8.

During Plaintiff's 2007 incarcerations at the Garfield County Detention Facility, Plaintiff was an inmate in the custody of the Oklahoma Department of Corrections (ODOC), and was on a physician-ordered diabetic diet. Plaintiff's Objections to Defendant Winchester's Motion for Summary Judgment (Oklahoma Dep't of Corr. Medical Diet Request).  [Doc. No. 140-13, p. 16].  Plaintiff states that upon his 2007 transfers from the ODOC facility in Holdenville to the Garfield County Detention Facility, he observed ODOC medical staff place his insulin dosage instructions, diabetic diet orders, insulin, and other medications into a brown paper bag that was given to the Garfield County escorting deputy. Declaration in Support of Plaintiff's Objections to and Brief in Support to Defendant Johnson's Motion for Summary Judgment, Doc. No. 138 ¶ 4, 5.  The ODOC Medical Transfer Summary form indicates that Plaintiff required a 2500 calorie diabetic diet. Plaintiff's Objections to Defendant Johnson's Motion for Summary Judgment, Ex. 3 (Oklahoma Dep't of Corr. Medical Transfer Summary).  [Doc. No. 139-4, p. 1].

Upon booking into the Garfield County Detention Facility in 2007, Plaintiff did not complete a health questionnaire or receive any medical screening.  Declaration in Support of Plaintiff's Objections to and Brief in Support to Defendant Johnson's Motion for Summary Judgment, Doc. No. 138, at ¶ 6, 7.  During his March 2007 incarceration, Plaintiff's blood sugar ranged from 160-527, and was in excess of 200 mg on eight of the eleven occasions on which his blood sugar was reported on the Garfield County Detention Facility F.S.B.S./B.P. Log.  Plaintiff's Objection to Defendant Johnson's Motion for Summary Judgment, Ex. 6.  During his 2007 incarceration at the jail, Plaintiff had problems receiving an accurate dose of insulin on two or three occasions.  Motion for Summary Judgment of Taylor and Johnson, Ex. 1 (Deposition of Plaintiff, p. 66, l. 1-3).  Plaintiff believed he was harmed in that his blood sugar "got up to a high level," and on one occasion after he had been returned to his ODOC facility from the jail, he told the ODOC nurse that he was "feeling dizzy and stuff," and she did a test for ketones.  Id. at p. 68.

Although Plaintiff makes no stand alone claim related to it, a medical transport form dated July 7, 2004, shows that during a previous incarceration at GCDF, Plaintiff was transported to the hospital from the Garfield County Detention Facility for a medical problem described as "diabetic."  Plaintiff's Objection to Defendant Johnson's Motion for Summary Judgment, Ex. 5.  Although he was not admitted, the transporting deputy's comment was "Doctors said fluctuations in blood sugar are due to not having FSBS tests done regularly, and not getting his insulin on sliding scale prior to meals."  Id.

On April 17, 2003, the United States Department of Justice reported its findings

regarding conditions of confinement at the Garfield County Jail to the Garfield County Commissioners.[10] Plaintiff's Objections and Brief in Support to Defendant Bill Winchester's Motion for Summary Judgment, Ex. 7.  The section of the report concerning medical care found, among other things, that the intake screening process was insufficient, that the jail fails to provide timely treatment to those who need it, and fails to collect accurate information to guide future care.  Id. at p. 10.  It further found that neither a medical professional nor jail administrators review inmate responses to the medical intake screening questions.  Id.  It found that the jail nurse follows no treatment protocols, and was practicing beyond her clinical scope.  Id. at p. 12.  It found that the jail had no policies concerning the management of medical emergencies, and that a medical professional failed to see inmates with chronic illnesses on a regular schedule.  Id. at p. 13.  It found that there were no written protocols in place for the preparation of medical diets from a registered dietician or medical professional.  Id. at 15.

The report sets forth a list of nineteen remedial measures in the area of medical care, including retention of the services of a medical doctor to supervise medical care, review screening forms and processes, monitor serious or chronic conditions, and annually review policies concerning medical care; ensuring that inmates who require medically appropriate nutrition receive an appropriate diet as ordered by a physician; train detention officers regarding their role in securing access to acute and emergent care for inmates and provide

---

[10]This was the old jail prior to the opening of the Garfield County Detention Facility.

adequate staff for this purpose; staffing the jail so that inmates requesting acute and emergent care may be treated timely and appropriately; and developing policies and procedures for a chronic care system. Id. at 20-22.

The report of Dr. Joseph P. Fowlkes, prepared at the request of the Special Litigation Section of the Civil Rights Division of the Department of Justice, states that the jail has "no policies concerning the management of medical or psychiatric emergencies." Id. (Report of Dr. Joseph P. Fowlkes, M.D., p. 5) [Doc. No. 140-6, p. 29]. He opined that the jail needs "to revisit their entire medical program." Id. at p. 9.

In response to Plaintiff's request for production of documents in this action, Defendant Winchester stated that there are no written protocols pertaining to emergencies or the treatment and assessment of diabetic symptoms. Id. at Ex. 13, Response No. 1 [Doc. No. 140-12, p. 1]. In response to Plaintiff's request for production of documents regarding the policy, custom, or practice of the Garfield County Detention Facility for dealing with medical emergencies when a nurse is not available, Defendant Taylor references a document identified by Bates-stamped number only as "DDR-9-000001 to DDR 9-000008." Id. at Ex. 12, Response No. 9 [Doc. No. 140-11, p. 3-4]. She identified the same documents in response to Plaintiff's request for "the policy, custom, or practice of Garfield County Jail, on how medications are to be administered, logged, or recorded, and who or what type of staff members are responsible for these duties." Id at Response No. 12.

Defendant Winchester, as Sheriff of Garfield County, is responsible for the preparation and adoption of procedures for operation of the Garfield County Detention

19

Facility. County Commissioner's Motion for Summary Judgment, Ex. 3; Defendants Taylor

and Johnson's Motion for Summary Judgment and Brief in Support, p. 11-12 ¶ 35; Defendant

Bill Winchester's Motion for Summary Judgment and Brief in Support, p. 3 (incorporating

statement of undisputed facts in Defendants Taylor and Johnson's Motion for Summary

Judgment and Brief in Support).

## IV. DISCUSSION

It has been well-established for over thirty years that a prison official's deliberate

indifference to a prisoner's serious medical needs violates the Eighth Amendment's[11] ban on

cruel and unusual punishment if the deliberate indifference "constitutes the unnecessary and

wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (internal citation and

quotation marks omitted). To prevail on a claim under 42 U.S.C. § 1983, "a prisoner must

allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious

medical needs." Id. at 106. The Supreme Court clarified the standards applicable to a claim

that a prison official has been deliberately indifferent to an inmate's medical needs in

violation of the Eighth Amendment in Farmer v. Brennan, 511 U.S. 825 (1994) and set forth

the now familiar two-pronged inquiry, comprised of an objective and subjective component.

Under the objective inquiry, the alleged deprivation must be "sufficiently serious" to

constitute a deprivation of constitutional dimension. Id. at 834. Under the subjective

---

[11] Because the Plaintiff was a pretrial detainee during some of the relevant time, his claims are governed by the Fourteenth Amendment's Due Process Clause. Craig v. Eberly, 164 F.3d 490, 495 (10th Cir. 1998). However, the scope of this protection is coextensive with the Eighth Amendment. Id.

inquiry, the prison official must have a "sufficiently culpable state of mind." Id.

In Mata v. Saiz 427 F.3d 745, 751 (10th Cir. 2005), the Tenth Circuit Court of Appeals provided a thorough summary of the law applicable to such claims:

> A prison official's deliberate indifference to an inmate's serious medical needs is a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. The test for constitutional liability of prison officials "involves both an objective and a subjective component."
>
> The prisoner must first produce objective evidence that the deprivation at issue was in fact "sufficiently serious." We have said that a "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of an Eighth Amendment claim. Moreover, a delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain."
>
> The subjective prong of the deliberate indifference test requires the plaintiff to present evidence of the prison official's culpable state of mind. The subjective component is satisfied if the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." A prison medical professional who serves "solely ... as a gatekeeper for other medical personnel capable of treating the condition" may be held liable under the deliberate indifference standard if she "delays or refuses to fulfill that gatekeeper role."

Id. at 751 (citations omitted).

With these standards in mind, the undersigned will address the motions for summary judgment of Defendants Taylor, Johnson, and Winchester. Although there is some overlap in the analysis of each motion, the dispositive issues differ in some significant respects; thus,

each of the three movant's motions for summary judgment will be addressed separately.

## A.  MOTION FOR SUMMARY JUDGMENT OF DEFENDANT JOHNSON

At the outset, the undersigned again notes that the Court has previously dismissed Plaintiff's § 1983 and state law claims against Defendant Johnson arising from his 2005-2006 incarceration. [Doc. No. 135, p. 2, 6].  Accordingly, the only claims remaining against her are those relating to Defendant Johnson's alleged failure to provide a medically-prescribed diabetic diet during his three separate incarcerations at GCDF in 2007.

### 1.  Failure to Show Deliberate Indifference

In her first proposition in support of summary judgment, Defendant Johnson argues that Plaintiff has failed to show that she was indifferent to his serious medical needs. Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, p. 12. Defendant Johnson argues that during Plaintiff's May 2007 incarceration at the GCDF, she examined him and spoke to him about his insulin and blood sugar levels. Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, p. 17.  She further claims that his medication log and medical progress notes from March 2007 show that he was administered numerous medications and that the jail followed ODOC's medical orders.  Id.  She argues that the "menu served to prisoners at the Garfield County Jail was approved by a licensed dietician," that she never received orders from jail physicians prescribing a diabetic diet for Plaintiff, and that to "the best of [her] knowledge" the GCDF did not receive any orders from ODOC regarding a physician-ordered diabetic diet menu for Plaintiff. Defendants Misty Taylor and Kim Johnson's Motion for Summary

Judgment and Brief in Support, p. 18-19; Id. at Ex. 5 ¶¶ 4, 6 (Affidavit of Kim Johnson, L.P.N.)  She concludes that "Plaintiff has failed to identify any action by Defendant[] ... Johnson regarding his diet which did not comply with his physicians' orders" and that "[b]ased on these circumstances, [she], who would not have been the [one] to order or approve a specific diet, did not exhibit a 'culpable' state of mind regarding Plaintiff's diet." Id. at p. 19.

Plaintiff responds that he observed ODOC medical staff place his insulin dosage and diabetic diet orders into a brown paper bag that was given to the Garfield County transporting deputy, and that a transport summary was completed stating that he was on a prescribed diabetic diet.  Plaintiff's Objections and Brief in Support to Defendant Johnson's Motion for Summary Judgment, Att. ¶¶ 4, 5 (Declaration of Larry Lemay) [Doc. No. 138. p. 4].  Plaintiff has also provided a copy of the ODOC Medical Transfer Summary showing a dietary requirement of "Diabetic 2500."  Plaintiff's Objection to Defendant Johnson's Motion for Summary Judgment, Ex. 3  Plaintiff testified that he was not given a medical questionnaire to complete upon his March 2007 transfer to GCDF, but that he did tell another jail staff member that he was on a diabetic diet.  Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, Ex. 1 (Deposition of Larry Lemay, p. 67-68).  Plaintiff argues  that his March 2007 medical notes from GCDF show high blood sugar, including a reading of 527, and that this was caused by Defendant Johnson's failure to provide his prescribed diabetic diet.  Plaintiff's Objection to Defendant Johnson's Motion for Summary Judgment, p. 5 & Ex. 6  [Doc. No. 139].  Plaintiff also testified in his

deposition that on one occasion he was feeling "dizzy and stuff" upon his return to ODOC, and that the ODOC nurse did a test for ketones. Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, Ex. 1 (Deposition of Larry Lemay, p. 68, l. 15-25).

First, it is uncontroverted that Plaintiff never received a diabetic diet during any period of incarceration at the Garfield County Detention Facility.  Plaintiff's Objections and Brief in Support to Bill Winchester's Motion for Summary Judgment, Ex. 14, Response No. 5 (Defendant Misty Taylor's Responses to Plaintiff's Third Requests for Admissions) [Doc. No. 140-13, p. 2].  Furthermore, it is uncontroverted that a diabetic diet was prescribed by ODOC in 2007,  Plaintiff's Objections and Brief in Support to Defendant Bill Winchester's Motion for Summary Judgment, Ex. 14, p. 16 [Doc. No. 140-13, p. 16], and that Plaintiff saw ODOC medical personnel place information regarding his medication and diabetic diet in a paper bag that was given to the Garfield County deputy who transported him to GCDF. Plaintiff's Objections and Brief in Support to Defendant Johnson's Motion for Summary Judgment, Declaration, ¶ 4-5 [Doc. No. 138, p. 4]. Plaintiff has also provided a copy of his medical transfer summary, dated March 9, 2007, showing that he was on a prescribed diabetic diet.  Plaintiff's Objection to Defendant Johnson's Motion for Summary Judgment, Ex. 3. Plaintiff has also provided a copy of ODOC's Chronic Illness Management Treatment Plan, dated April 3, 2006, which reflects that Plaintiff suffered from severe insulin-dependent diabetes.  Plaintiff's Objections and Brief in Support to Defendant Bill Winchester's Motion for Summary Judgment, Declaration, p. 4 [Doc. No. 140-15, p. 4].  Plaintiff also relies on a

GCDF medication administration record bearing a date of November 3, 2005, which states in the blank provided for special diet, "Is Diabetic."  Plaintiff's Objection to Defendant Johnson's Motion for Summary Judgment, Ex. 4 [Doc. No. 139-5].

Defendant Johnson apparently does not take issue with the proposition that the failure to provide a medically-prescribed diabetic diet can be sufficiently serious to support the objective component of a claim for deliberate indifference to medical needs.  Indeed, the Tenth Circuit Court of Appeals has held as much.  See Thompson v. Gibson, 289 F.3d 1218, 1222 (10th Cir. 2002). However, Defendant Johnson argues that she did not have the requisite culpable state of mind because Plaintiff was not on a prescribed medical diet, and that she was not the one to order such a diet.  Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, p. 19. She states that no facility physician ordered a diabetic diet, and that to "the best of [her] knowledge" Plaintiff was not on an ODOC prescribed diabetic diet at the time of his 2007 incarcerations.  Id. at Ex. 5 (Affidavit of Kim Johnson, ¶ 4-6) [Doc. 130-6, p. 1-2].

Based upon these facts, the undersigned finds that Plaintiff's § 1983 claims against Johnson related to his 2007 incarcerations in GCDF should survive Defendant Johnson's motion for summary judgment.  First, the failure to provide an inmate who has severe, insulin-dependent  diabetes with a medically-prescribed diabetic is a sufficiently serious deprivation of medical care; thus it satisfies the objective component of an Eighth Amendment claim. See Thompson, 289 F.3d at 1222.  Second, Defendant Johnson does not dispute Plaintiff's claim that information regarding the required diet was contained on an

ODOC medical transport summary given to GCDF, and that he told jail staff about his diet upon booking. She also fails to dispute the fact that Plaintiff was noted to have a diabetic special diet during his previous incarceration in November 2005.  Moreover, although any stand alone claim against Defendant Johnson stemming from Plaintiff's incarceration in the GCDF from October 2005-February 2006 is time-barred, the undisputed facts during that time period show that she was already aware of the seriousness of Plaintiff's diabetic condition by 2007.  The subjective component of an Eighth Amendment claim for failure to provide medical care may be satisfied by such circumstantial evidence:

> An inmate "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." An official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Significantly, this level of intent can be demonstrated through circumstantial evidence.*

Mata v. Saiz  427 F.3d 745, 752 (10th Cir. 2005) (citations omitted) (emphasis added). As noted above, Defendant Johnson only swears that to  "the best of [her] knowledge" Plaintiff was not on an ODOC prescribed diabetic diet at the time of his 2007 incarcerations.  Id. at Ex. 5 (Affidavit of Kim Johnson, ¶ 4-6) [Doc. 130-6, p. 1-2].

Viewing the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party,  Calhoun v. Gaines, 982 F.2d 1470, 1472 (10th Cir. 1992), the undersigned finds that a reasonable jury could decide that Defendant Johnson refused to provide a diabetic diet to Plaintiff despite her knowledge or "strong suspicion" that one had

been prescribed by ODOC. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). Put another way, the Court would have to resolve this genuine issue of material fact against Plaintiff in order to grant summary judgment for Defendant Johnson – an action inconsistent with the governing standard.

### 2. Personal Participation

Defendant Johnson also moves for summary judgment on grounds that Plaintiff has failed to link her to any constitutional violation.  Defendant's Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, p. 19 [Doc. No. 130].  More specifically, she argues that Plaintiff's physicians were the ones to determine what diet should have been provided, preventing Plaintiff from affirmatively linking her to his claims regarding the failure to provide a diabetic diet.  Id. at 20.

It is axiomatic that personal participation is an essential element of a 42 U.S.C. §1983 action seeking damages from a defendant in his or her individual capacity. Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir. 1996) (quotation omitted);  Olson v. Stotts, 9 F.3d 1475, 1477 (10th Cir. 1993); Bennett v. Passic, 545 F.2d 1260, 1262-1263 (10th Cir. 1976). However, implicit in her contention that she would have provided Plaintiff with a diabetic diet if one had been ordered by a physician is that she personally participates in the process of providing medical diets to inmates at GCDF. Defendant Johnson's Reply to Plaintiff's Response to Motion for Summary Judgment, p. 3 [Doc. No. 145]; Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, Ex 5. Even if her decision not to provide a diet were vindicated by the absence of physician's orders, such

would not change the underlying fact that she serves as gatekeeper with regard to medical diets. The presence of physician orders may inform her decision to provide a special medical diet, but Plaintiff has come forward with facts showing that such a diet is not available to inmates without Defendant Johnson's involvement and/or approval as facility nurse.

### 3. Qualified Immunity

Defendant Johnson next contends that she is entitled to summary judgment on grounds of qualified immunity. Defendant's Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, p. 21, 23 [Doc. No. 130].

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation" if the complained of behavior did not violate clearly established law. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). It protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Once a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to show both that (1) the defendant violated a constitutional or statutory right and (2) the constitutional or statutory right was clearly established when the alleged violation occurred. Verdecia v. Adams, 327 F.3d 1171, 1174 (10th Cir. 2003) (considering qualified immunity defense in summary judgment context); see also Cortez v. McCauley, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc). Recently, the Supreme Court gave district courts the discretion to resolve this two-part inquiry in whatever order best fits the circumstances presented in a particular case:

while the sequence set forth [in <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001)] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

<u>Pearson v. Callahan</u>, 129 S.Ct 808, 818 (2009).  If the plaintiff fails to satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity.  <u>Gross v. Pirtle</u>, 245 F.3d 1151, 1156 (10th Cir. 2001).

According to Defendant Johnson, Plaintiff has not demonstrated the violation of clearly established federal rights.  <u>Id.</u>  As noted above, however, the evidence is conflicting regarding the existence of a constitutional violation.  <u>See</u> supra p. 26.  Moreover, a prisoner's constitutional right to obtain a prescribed diet was clearly established at the time of his 2007 incarcerations at GCDF.  <u>Thompson v. Gibson</u>, 289 F.3d 1218, 1222 (10th Cir. 2002); <u>see</u> <u>Worthen v. Ryan</u>, Case No. CIV-02-872-W, slip op. at 29-32 (W.D. Okla. June 2, 2004) (Roberts, M.J.) ( holding that a diabetic prisoner's right to receive a special diabetic meal was "clearly established," in 2002 for purposes of qualified immunity), <u>adopted</u> (W.D. Okla. Aug. 10, 2004) (West, J.); <u>LaGrange v. Jackson</u>, No. CIV-07-455-HE, slip op. at 15 (W.D. Okla. Aug. 22, 2007) (Bacharach, M.J.).  Accordingly, summary judgment on the issue of qualified immunity should be denied.

### 4.  Official Capacity Claims

Defendant Johnson also moves for summary judgment to the extent Plaintiff is suing her in her official capacity.  She argues that an official capacity suit against an employee is

just another way of pleading an action against the entity that employs her.  Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, p. 24.  She further contends that Oklahoma statutory law provides that the county sheriff is responsible for the operation and maintenance of the county jail, and that she has no policy-making authority with regard to the jail.  <u>Id.</u> at 24-25.  The undersigned agrees, and finds that Defendant Johnson is entitled to summary judgment with regard to Plaintiff's claim against her in her official capacity.

A local government such as a county cannot be liable under § 1983 for acts of an employee or official in his official capacity "unless that official possesses final policymaking authority to establish municipal policy with respect to acts in question." <u>Houston v. Reich</u>, 932 F.2d 883, 887 (10th Cir.1991) (citing <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469 (1986)). Put another way, for a local government unit such as Garfield County to be liable for violating § 1983 due to the allegedly unconstitutional act of Defendant Johnson, she must have the authority to establish the County's governmental policy or custom. <u>Monell v. Dep't of Social Services</u>, 436 U.S. 658, 694 (1978); <u>Clark v. City of Draper</u>, 168 F.3d 1185, 1187 n. 5 (10th Cir.1999) (interpreting <u>Monell</u> ).

Defendant Johnson has shown that there are no facts indicating that she has final policy making authority over the GCDF, thus meeting her initial burden under the applicable summary judgment standard. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986) ( the moving party initially bears the burden only of " 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case.").

Plaintiff has failed to come forward with any facts supporting this essential element of his official-capacity claim against Defendant Johnson.   Thus, she is entitled to summary judgment in her official capacity.

### 5.  State Law Claims

Defendant Johnson also moves for summary judgment with regard to any state law claims stemming from Plaintiff's 2007 GCDF incarcerations.  Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, p. 26.  She claims that the Governmental Tort Claims Act (GTCA), Okla. Stat. tit. 51, § 151 et.seq., is the exclusive remedy by which a plaintiff can recover against a governmental entity for an alleged tort committed by an employee acting within the scope of her employment.   Id.  She also contends that because she was acting within the scope of her employment with regard to the acts which form the basis of Plaintiff's state law claims,  Id.  at 27, she is not a proper defendant in an action under the GTCA.   Id.   She claims that an act of a government employee is only outside the scope of her employment when the act is malicious or done in bad faith.  Id.  She also makes the claim that Plaintiff's tort claims based on his "2006-07" incarceration are time barred even if she were acting outside the scope of her employment. Id. at 28.

As pointed out by Defendant Johnson, "Scope of employment" means performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority ...." Okla. Stat. tit. 51, § 152(11); see, e.g., Washington v. Barry, 55 P.3d 1036, 1039 (Okla. 2002) (pursuant to the

GTCA, prison employee defendants are expressly immunized from liability while acting within the scope of their employment);  Cooper v. Millwood Independent School Dist. No. 37, 887 P.2d 1370, 1374 (Okla. Civ. App. 1994) ("Although employees of the state are protected from tort liability while performing within the scope of their employment, such protection does not render such employees immune from liability for willful and wanton negligence or other conduct which places the employees outside the scope of their employment.");  see Houston v. Reich, 932 F.2d 883, 890 (10th Cir. 1991) (individual defendants forfeited their immunity from liability under the GTCA where jury found defendants acted willfully, wantonly and in reckless disregard of plaintiff's constitutional rights).

Plaintiff contends that employees do not have immunity for willful and wanton conduct, and are not immune when they act in reckless disregard.  Plaintiff Larry Lemay's Reply to Defendant Kim Johnson's Reply to Plaintiff's Objections to Her Motion for Summary Judgment, p. 6. [Doc. 147].  The undersigned agrees.

The deliberate indifference standard applicable to Eighth Amendment denial or delay of medical treatment claims is similar to that needed to remove the immunity enjoyed by individual employees under the GTCA:

> The deliberate indifference standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." The Supreme Court in Farmer analogized this standard to criminal recklessness, which makes a person liable when she consciously disregards a substantial risk of serious harm. Thus, "[d]eliberate indifference does not require a finding of express intent to harm." An inmate "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is

enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." An official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." Significantly, this level of intent can be demonstrated through circumstantial evidence:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

> This is so because "if a risk is obvious so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it."

Mata v. Saiz  427 F.3d 745, 752 (10th Cir. 2005) (internal citations omitted).  Moreover, the Oklahoma Supreme Court has held that the scope of employment question should be decided by the court only where the answer is clearly indicated.  Nail v. City of Henryetta, 911 P.2d 914,  918 (Okla.1996) ("The question of whether an employee has acted within the scope of employment at any given time is normally a question for the jury, except in cases where only one reasonable conclusion can be drawn from the facts").

Accordingly, for the same reason that summary judgment should be denied on Plaintiff's Eighth Amendment claim against Defendant Johnson, it should also be denied on his state tort law claims due to the presence of a genuine issue of material fact on the scope of employment issue.  Accordingly, Defendant Johnson's motion for summary judgment on Plaintiff's state law claim for his 2007 incarceration should be denied.

Although Defendant Johnson argues that Plaintiff's state law tort claims for his 2007

incarceration are time-barred even if she were acting outside the scope of her employment, the undersigned finds otherwise. The First Amended Complaint, in which Defendant Johnson was first named, was not filed until February 13, 2008.  The first 2007 incident which forms the basis of Plaintiff's claim occurred in March 2007.  Thus, Plaintiff's state law tort claims against Defendant Johnson are not barred under either the two-year general tort limitations period, or Oklahoma's one-year period applicable to cases filed by an inmate relating to acts which occurred while the inmate was in custody. Okla. Stat. tit. 12, § 95(A)(3) and (11).

### 6. Punitive Damages

Finally, Defendant Johnson moves for summary judgment on Plaintiff's claim for punitive damages. Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, p. 28.  She claims that "Plaintiff has not established a violation of his rights, let alone any evidence of malice, wantoness or oppressiveness." Id. However, the undersigned finds that the factual dispute as to whether Defendant Johnson was deliberately indifferent to Plaintiff's medical needs by refusing to provide a medically prescribed diabetic diet precludes summary judgment on the issue of punitive damages.

"Punitive damages are available only for conduct which is 'shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Searles v. Van Bebber, 251 F.3d 869, 879 (10th Cir. 2001) (citing Smith v. Wade, 461 U.S. 30, 56 (1983)). Because a genuine issue of material fact exists as to Defendant Johnson's state of mind, she is not entitled at this point to a declaration that no reasonable jury could find that the state of mind required for an award of punitive

damages exists.  Although not addressed by Defendant Johnson, the undersigned notes that the only physical harm identified by Plaintiff as the result of GCDF's failure to provide him a diabetic diet in 2007 was a high blood sugar reading in March 2007, and that he felt "dizzy and stuff" upon returning to ODOC from one of his 2007 GCDF incarcerations.  However, even if such were not a physical injury sufficient to support an award of damages[12] under 42 U.S.C. § 1997e(e), that would not preclude punitive damages as a matter of law.  Searles, 251 F.3d at 881.

In conclusion, it is recommended that Defendant Johnson's motion for summary judgment be denied as to Plaintiff's state and federal claims against her in her individual capacity with regard to his 2007 incarcerations at GCDF.  It is recommended that summary judgment be granted with regard to Plaintiff's official capacity claims.  Plaintiff's claims against Defendant Johnson stemming from his 2005-06 incarcerations have already been dismissed as time-barred.

## B.  MOTION FOR SUMMARY JUDGMENT OF DEFENDANT TAYLOR

Defendant Taylor moves for summary judgment on the same grounds as those raised by Defendant Johnson.   See Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, p. 12-28.  However, the undersigned finds one of those grounds dispositive of Defendant Taylor's motion: Plaintiff's failure to show her personal participation in the alleged constitutional violations.

---

[12]The undersigned makes no finding on this point as it has not been raised by Defendant Johnson.

Defendant Taylor apparently concedes that she served as GCDF's Jail Administrator at all times relevant to Plaintiff's action.  See id. at 20.  However, she argues that this is the only reason he has named her as a Defendant in this action.  Id.  She draws the Court to Plaintiff's deposition in which he states two facts in support of his claims against her: her position as Jail Administrator and the fact that she accompanied Defendant Johnson on one occasion when Johnson checked on him  Id.  (citing Ex. 1, Deposition of Larry Lemay, pp. 76-77) [Doc. No. 130-2, p. 39-40].

Plaintiff responds that Defendant Taylor "failed to correct unlawful conditions of confinement at [GCDF], which denied, delayed, and prevented Plaintiff's access to medical care...."  Plaintiff's Objections and Brief in Support to Defendant Misty Taylor's Motion for Summary Judgment, p. 6 [Doc. No. 142].  He claims that she was "aware of the risks, and failed to correct the unlawful conditions which resulted in Plaintiff's injury."  Id.  He claims that as jail administrator she "certainly ... knew" and "had to know of the poor conditions of confinement...."  Id. at 8, 10.  He states that although he "cannot locate the response from Defendant Winchester, he has stated during the course of discovery that Defendant Taylor is an individual who was responsible to see that Plaintiff's medical care needs were met while incarcerated at [GCDF]."  Id. at 8.  He claims that he "submitted several grievances to Defendant Taylor about having problems receiving insulin dosages, diabetic diet, and blood sugar tests as were needed."  Id.  He also claims that GCDF did not provide inmate orientation or handbooks, or advise him about how to file a grievance or obtain emergency medical care.  Id.  at 9.

36

Despite these conclusory statements, the undersigned finds that Plaintiff has failed to come forward with any evidence linking Defendant Taylor to the alleged violation of his Eighth Amendment rights.  As noted by Defendant Taylor, Plaintiff testified at his deposition as follows:

Q. [By counsel for Taylor]: Okay.  Now, what about Misty Taylor, why are you suing Misty Taylor?

A. I know she's the jail administrator.  She was responsible for the day-to-day operations.  I know some of the discovery requests Sheriff Winchester said she was also responsible for medical care at the jail.  And there was one day in December of 2005 when I was incarcerated, when the nurse came around, checking my blood sugar, to give me my insulin, Misty Taylor came by with her so - -

Q. So one day she checked your blood sugar or gave you insulin?  Or was just there with the nurse at this time?

A. She was there with the nurse.

Q. Any other occasions that you saw Misty Taylor in the jail where you were incarcerated?

A. I believe she had notarized a legal document for me in the past, and just here and there I would see her different times through the jail.

Q. Did you have any conversations with her about your conditions?

A. Yeah, I had filed some grievances to her regarding my diet and my blood sugar testing.

Q. Did you have any conversations with her specifically, or did you just file the grievances?

A. I believe I had a conversation specifically.  I don't recall what specific day it was, but I had talked to her about not getting - - I was worried about my medical care, about my blood sugar issue.

Q.  Do you recall what month this may have occurred in, before or after your hospital visit?

A.  It was before the hospital visit.

Q.  What month roughly, if you know?

A.  Probably would have been November or December of '05.

Q.  Any other basis that you are suing her for?

A.  No, that's it.

Defendants Misty Taylor and Kim Johnson's Motion for Summary Judgment and Brief in Support, Ex. 1 (Deposition of Larry Lemay, pp. 76-77) [Doc. No. 130-2, p. 39-40]. Plaintiff has provided a copy of a grievance dated November 22, 2005, in which he complains about "John" failing to test his blood sugar once when Plaintiff felt that it was high, despite his specific request for testing. Plaintiff's Objections and Brief in Support to Defendant Bill Winchester's Motion for Summary Judgment, Ex. 14, p. 4 [Doc. No. 140-13, p. 4]. Defendant Taylor was the one who responded to this grievance, stating "I have talked to John about this - He apologizes." Id.

As discussed above in connection with Defendant Johnson's motion, personal participation is an essential element of a § 1983 claim. Bennett, 545 F.2d at 1262-63. Therefore, a supervisor such as Defendant Taylor incurs no § 1983 liability for a subordinate's conduct which results in the deprivation of a constitutional right unless an "affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."

Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988) ( quotations and alterations omitted); see also Serna v. Colo. Dep't of Corr., 455 F.3d 1146, 1151 (10th Cir. 2006) ("[A] plaintiff must show an 'affirmative link' between the supervisor and the [constitutional] violation, namely the active participation or acquiescence of the supervisor in the constitutional violation by the subordinates." (quotation omitted)).  Since "there is no concept of strict supervisor liability under section 1983," Jenkins v. Wood, 81 F.3d 988, 994 (10th Cir. 1996) (quotation omitted), a supervisor is liable for his subordinate's conduct only if he is "personally involved in the constitutional violation and a sufficient causal connection . . . exist[s] between the supervisor and the constitutional violation." Serna, 455 F.3d at 1151 (quotation omitted).

Plaintiff has failed to come forward with evidence showing such a link between Defendant Taylor and the alleged violation of his constitutional rights.  Plaintiff's claim that Defendant Taylor "certainly" or "should have known" about the events he alleges is insufficient if it is based only on the fact that she is the administrator of the GCDF.  Plaintiff states that Defendant Taylor came with Defendant Johnson when the latter came to check his blood sugar and/or insulin, but that alone does not demonstrate that she was aware of any problem in him receiving medical care.  Furthermore, although Defendant Taylor did respond to one of Plaintiff's grievances regarding the failure of a jailor to respond to his request for blood sugar testing, her response indicates only that she did follow up with the employee in question and reported back to Plaintiff.  Plaintiff has pointed to no facts showing her participation or acquiescence in the acts which form the basis of Plaintiff's claims.

Accordingly, Defendant Taylor is entitled to summary judgment on Plaintiff's federal claims.[13]

Similarly, because Plaintiff has failed to come forward with any facts showing Defendant Taylor's active participation or acquiescence in the acts he complains of, he cannot establish that she acted outside the scope of her employment for purposes of the GTCA. Accordingly, she is not a proper defendant under the GTCA. Okla. Stat. tit. 51 § 163(C) (suits instituted pursuant to the GTCA shall name as defendant the political subdivision against which liability is sought; and an employee of the political subdivision acting within the scope of his employment shall not be named as defendant.) Therefore, it is recommended that summary judgment also be granted in Defendant Taylor's favor with regard to Plaintiff's state law claims.

Furthermore, for the same reasons discussed above with regard to Defendant Johnson, Defendant Taylor should be granted summary judgment with regard to Plaintiff's action against her in her official capacity. Oklahoma law provides that the sheriff is responsible for operation and maintenance of the county jail, and has final policymaking authority. See Okla. Stat. tit. 19, § 513; Lopez v. LeMaster, 172 F.3d 756, 763 (10th Cir. 1999) (sheriff is a final

---

[13]Because Defendant Taylor is entitled to summary judgment on Plaintiff's federal claims, there is no need to address her motion for summary judgment on grounds of qualified immunity. See Pearson v. Callahan, 129 S.Ct 808, 818 (2009) (district courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand).

policymaker with regard to its jail).

In light of the foregoing, Defendant Taylor should be granted summary judgment on Plaintiff's federal claims, his claims under Oklahoma law, and his claims against her in her official capacity.  This would dispose of all Plaintiff's claims against Defendant Taylor.

**C.    MOTION   FOR   SUMMARY   JUDGMENT   OF   DEFENDANT WINCHESTER**

Defendant Winchester moves for summary judgment on four grounds.  First, he contends that he is entitled to summary judgment with regard to Plaintiff's individual capacity claims against him.  Defendant Bill Winchester's Motion for Summary Judgment and Brief in Support, p. 5.  Second, he claims that he is entitled to summary judgment on Plaintiff's official capacity claims because Plaintiff has not shown that any policy or custom of Defendant Winchester was the direct cause of his constitutional injuries.  Id. at 9.  Third, he seeks summary judgment on Plaintiff's claims under Oklahoma law for two reasons: (1) violations of state law alone will not support a claim under § 1983; and, the Governmental Tort Claims Act contains a specific exemption from liability for claims based on the operation of a jail.  Id. at 12-13.  Finally, Defendant Winchester moves for summary judgment with regard to Plaintiff's claim for punitive damages.  Id. at 14.  He argues that punitive damages are not recoverable in an official-capacity claim under § 1983, that Plaintiff has not shown evidence of evil motive or intent necessary to an award of punitive damages in his individual capacity, and that punitive damages are not recoverable under the GTCA.

### 1.  Section 1983 Claims Against Defendant Winchester Individually

First, Defendant Winchester claims that Plaintiff cannot show that he was personally involved in the incidents which form the basis of Plaintiff's § 1983 claims. Id. at 7.  More specifically, Defendant Winchester argues that Plaintiff has wholly failed to demonstrate that he was personally involved in providing Plaintiff's medical care or diet. Id. at 7.  In fact, he contends that Plaintiff has conceded as much. Id.  Defendant Winchester also claims that he is not liable in an individual capacity as a  supervisor because Plaintiff has failed to come forward with any affirmative link between his supervision and the alleged constitutional violations. Id.

The undersigned agrees that Plaintiff has failed to come forward with facts showing Defendant Winchester was personally involved in the provision of Plaintiff's medical care or diabetic diet. Indeed, in his deposition, Plaintiff testified that he cannot say whether Defendant Winchester was aware of his specific situation, and that he never spoke to or had any dealings with Defendant Winchester. Id. at Ex. 1, p. 5-6 (Deposition of Larry Lemay, p. 74-75) [Doc. No. 131-2, p. 5-6].  More pointedly, he agreed that Defendant Winchester did not "do anything personally ... to violate [his] rights in anyway." Id. at Ex. 1, p. 6 ((Deposition of Larry Lemay, p. 75) [Doc. No. 131-2, p. 6].  He testified in his deposition that his claims were instead based on Defendant Winchester's jail policies. Id. at Ex. 1, p. 7 (Deposition of Larry Lemay, p. 78) [Doc. No. 131-2, p. 7].

However, individual liability can be based on a defendant's personal participation as a  supervisor. To   properly show supervisory liability, the inmate must identify an

"affirmative link" between the constitutional deprivation and the supervisor's personal participation, *his exercise of control or direction*, or his failure to supervise.  See Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997) (emphasis added).  Because the exercise of control or direction can constitute personal participation for the purpose of establishing individual liability, the policies of a supervisor can subject him to liability if there is an affirmative link between one of those policies and a constitutional violation. This theory of supervisory liability was explained by the Third Circuit Court of Appeals :

> There are two theories of supervisory liability that are applicable to this case. The first involves [the defendants'] roles as policymakers.... Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."

A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center,  372 F.3d 572, 586 (3rd Cir. 2004).  Thus, the fact that Plaintiff's claims against Defendant Winchester are based solely upon the promulgation of jail policy does not preclude the possibility of individual liability.[14] The promulgation of jail policies is clearly an exercise of control or direction: a recognized form of supervisory liability.

Thus, the question becomes whether Plaintiff has come forward with any evidence linking the policies of Defendant Winchester to a violation of Plaintiff's Eighth and Fourteenth Amendment rights. For the reasons discussed below in connection with

---

[14]As will be discussed below, *final* policymaking authority is required before an official's policies can subject his political subdivision to liability for a policy that causes the violation of a constitutional right.

Defendant Winchester's motion for summary judgment on Plaintiff's official capacity claims, the undersigned finds that Plaintiff has indeed made the required showing.

### 2. Section 1983 Official Capacity Claims Against Defendant Winchester

Defendant Winchester next moves for summary judgment on grounds that Plaintiff has presented insufficient evidence of a policy or custom which was a direct cause of his alleged constitutional injuries. Defendant Bill Winchester's Motion for Summary Judgment and Brief in Support, p. 9. He claims that "[i]n fact, the policy of the Garfield County Detention Facility was to 'insure the health care services within the Detention Facility are adequate for the facility and managed in accordance with accepted health care policies and procedures." Id. at 10. He further claims that Plaintiff was provided "regular and thorough medical care even though he attempted to sabotage the administration of his insulin and consumed an excessive amount of sweets and junk food." Id. He claims that Plaintiff's failure to identify an unconstitutional policy or custom of Defendant Winchester or demonstrate a violation of his constitutional rights entitles Winchester to judgment as a matter of law. Id. at 12.

Plaintiff responds that the policy of ensuring adequate health care services is a "sham," and that the GCDF custom is instead one of inadequate training, medical decision making by non-medical personnel, and the denial and delay of medical care. Plaintiff's Objections and Brief in Support to Defendant Bill Winchester's Motion for Summary Judgment, p. 4-5.

Plaintiff identifies the following customs or policies which he claims resulted in the

violation of his Eighth and Fourteenth Amendment rights to medical care: the absence of any policies or procedures for the preparation of special diets which have been prescribed for inmates; the absence of a staff dietician; the failure to hire any "trained professionals in medical dietary needs" to compensate for the deficiency in staffing and procedures needed to comply with orders for a special diet; requiring non-medical personnel to make medical diagnoses and medical decisions; inadequate staffing of a facility nurse; and the inadequate training of staff with regard to the assessment of and response to medical emergencies. Id. at 10-13. He claims that these deficiencies created both a serious risk of harm, and a delay in his receipt of medical care on January 5, 2006, which resulted in substantial harm in the form of dizziness, abdominal pain, and breathing problems. Id. at 13-14. Plaintiff further argues that Defendant Winchester was aware of these deficiencies in medical policies and procedures by virtue of the 2003 Department of Justice report, and he had ample time to correct them prior to Plaintiff's incarceration, but failed to do so. Id. at 11-12.

In reply, Defendant Winchester argues that Plaintiff has not sufficiently asserted a claim for failure to train GCDF employees, that a diabetic diet was available at GCDF but was "ultimately" not prescribed, that Plaintiff's consumption of large quantities of sweets would have counteracted a diabetic diet in any event, and that the absence of a nurse on the premises on January 5, 2006, did not "in any manner influence the medical care he received." Defendant Winchester's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, p. 4, 7-8.

In order to establish a claim against Defendant Winchester in his official capacity as

45

the Sheriff of Garfield County, Plaintiff must show that the municipality's allegedly unconstitutional actions resulted from a policy or custom adopted or maintained with deliberate indifference to his constitutional rights. <u>Monell v. Dep't of Social Servs</u>., 436 U.S. 658, 690 & n. 55 (1978).  Under this standard, Plaintiff must identify a "policy" or "custom" that caused his injury. <u>Board of County Com'rs of Bryan County v. Brown</u>, 520 U.S. 397, 403 (1997).  As the Supreme Court has clearly explained, "it is not enough for a §1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." <u>Id.</u> at 404. Plaintiff has not identified any formal policy adopted by Defendant Winchester, who is the final policymaker for establishing jail policy, but has come forward with facts that support an inference that he made a "deliberate choice to follow a course of action" which resulted in a constitutional violation. <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 483 (1986).  He has also identified customs with regard to medical care that are "so widespread as to have the force of law" in connection with the claims alleged in the Complaint. <u>Brown</u>, 520 U.S. at 404.  He relies primarily upon the 2003 Department of Justice report to demonstrate the GCDF's customary approach to the issue of inmate medical care.

The report notes, among other things, that the provision of medical services to inmates at the jail is "seriously deficient and places inmates at risk of harm." Plaintiff's

Objections and Brief in Support to Defendant Bill Winchester's Motion for Summary

Judgment, Ex. 7, p. 10 [Doc. No. 140-6, p. 10].  In particular, the report noted the following

conditions relevant to this dispute: an insufficient medical intake screening process, resulting

in a system that fails to provide timely treatment to those who need it; the lack of review of

inmate responses to questions regarding medical problems by medical professionals or jail

administrators; the failure to immediately refer those inmates to a medical professional when

intake reveals serious medical needs; the failure of the facility nurse to follow any treatment

protocols, policies, or procedures when providing medical care; inadequate training of the

facility nurse to evaluate patients without a protocol or physician supervision - resulting in

practice beyond her clinical scope; the lack of any policies concerning the management of

medical emergencies; and an inadequate menu and no written instructions on preparing

medical diets.  Id. at p. 10, 12, 15.  The report of Dr. Joseph P. Fowlkes, attached to the

report, notes that the jail has no formal written procedures or policies governing medical

services at the jail, and has *no* policies concerning the management of medical emergencies.

Id. at 26, 29.

Defendant Winchester claims that the 2003 Department of Justice report involves a

time "much too remote from the time of the relevant events in this case," Defendant

Winchester's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment,

p. 5.  However, Plaintiff has submitted documents produced by Defendant Winchester

showing that the Department of Justice continued to correspond with Garfield County

officials as recently as November of 2007, in an effort to memorialize an agreement for

resolution of its dispute with the jail.  See Plaintiff's Objections and Brief in Support to Defendant Bill Winchester's Motion for Summary Judgment, Ex. 7, Doc. No. 140-6, p. 60-61.  Although the correspondence references some improvements in the conditions which were noted in the original report, it does not indicate whether the medical care deficiencies were ameliorated by the time of Plaintiff's incarceration.  Id.   Thus, the report is not so remote that it fails to raise a genuine issue of fact as to whether any or all of those conditions persisted at the time Plaintiff was in GCDF.  Furthermore, some responses to Plaintiff's discovery requests also support an inference that deficiencies do indeed persist. See, e.g. Id. at Ex. 9 [Doc. No. 140-8, p. 2] (no documents exist showing food prepared for inmates on a diabetic diet or instructions on preparation); Ex. 10 [Doc. No. 140-9, p. 12-13] (not sure what type of diabetic meals were served during 2005-2007); Ex. 12 [Doc. No. 140-11, p. 3] (no documents showing that regular jail menu was approved by a licensed dietician for consumption by Type I diabetics).

Furthermore, Plaintiff has shown that he was denied adequate treatment for his diabetes in that he did not receive blood sugar testing on a daily basis, and was not given insulin for his insulin pump at times. Defendant Winchester replies that any delay in receiving insulin was "brief" and that Plaintiff has not shown that these failures resulted in violation of his constitutional rights.  Defendant Winchester's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, p. 2, 8-9.  However, even if Plaintiff's claim regarding inadequate blood sugar testing and insulin coverage is construed as a delay in

receipt of medical care, rather than the denial[15] of chronic care, he has certainly shown enough facts to raise a genuine issue as to whether a failure to provide insulin resulted in his DKA on January 5, 2006. Defendants cannot seriously contend that the resulting harm on that occasion was not substantial; Plaintiff has shown that he was in pain, vomiting, having difficulty breathing,  drifting in and out of consciousness, and was ultimately hospitalized for seven days.

Defendant Winchester contends that Plaintiff's consumption of large quantities of sweets would have counteracted any beneficial effects of a diabetic diet.   Defendant Winchester's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment, p. 8.  He also argues that Plaintiff attempted to sabotage the administration of his insulin and consumed an excessive amount of sweets and junk food.   Id. at 2; Defendant Bill Winchester's Motion for Summary Judgment and Brief in Support, p. 10.  Not only is this disputed by Plaintiff, Defendant Winchester's own written policy regarding inmate health care specifically provides for medical segregation for "[i]mates whose health could be adversely affected by the ingestion of sweets, salt or other edible items on the commissary list," or who "do not show a willingness to comply with the dietary restrictions."  Ex. 2, p.

---

[15]If the failure to adequately treat a chronic medical condition were considered a "delay" rather than a "denial" of medical treatment, substantial harm would have to be shown in order to prove a constitutional violation.  The undersigned notes that this construction would permit a policy of inadequate care for chronic conditions, so long as the inmate's condition did not deteriorate to the point of substantial harm. Neither party has provided authority on which standard should apply to such conditions, but because Plaintiff has come forward with evidence of substantial harm on one occasion, the issue need not be addressed in order to deny summary judgment to Defendants Johnson and Winchester.

2-3 (Inmate Health Care).

In summary, Plaintiff has come forward with facts adequate to create a genuine issue of fact as to the existence of several customary polices of deficient medical care at the GCDF, and has also showed facts linking those policies and customs with his receipt of inadequate medical care, and a delay in care which resulted in substantial harm.  At this stage of the litigation, and in the context of a motion for summary judgment, the undersigned cannot resolve the plethora of inconsistencies contained in the evidentiary materials submitted by the parties herein.

### 3.  Defendant Winchester's Motion Regarding State Law Claims

Next, Defendant Winchester argues that Plaintiff cannot rely on violations of certain state statutes setting forth a sheriff's obligation to provide inmates with adequate diet and medical care to establish his § 1983 claim. He also claims that he is not liable for state tort claims, relying on various provisions of the GTCA.  Defendant Winchester's motion for summary judgment on any state law claims brought under the GTCA is most easily disposed of by reference to the specific exemption from liability for the "Provision, equipping, operation or maintenance of any prison, jail or correctional facility...." Okla. Stat. tit 51, § 155(24).  However, for the same reasons stated in addressing Defendant Johnson's motion for summary judgment, supra p. 32-35, the undersigned finds that it is a jury question as to whether Defendant Winchester was acting within the "scope of employment" in the implementation of several customary policies of allegedly deficient medical care which resulted in substantial harm to the Plaintiff.  Thus, Defendant Winchester is entitled to

50

summary judgment on claims based solely on state law under the GTCA, but is not entitled to summary judgment on any state law tort claims for acting outside the "scope of employment."

### 4.  Punitive Damages

Finally, Defendant Winchester moves for summary judgment on Plaintiff's claim for punitive damages.  Defendant Bill Winchester's Motion for Summary Judgment and Brief in Support, p. 14. Because punitive damages cannot be awarded against a county defendant in a section 1983 case, see McKee v. Heggy  703 F.2d 479, 483 (10th Cir.1983), Defendant Winchester is entitled to summary judgment on Plaintiff's claim for punitive damages against him in his official capacity.  However, for the same reasons discussed above with regard to Defendant Johnson, summary judgment is not appropriate with regard to punitive damages related to Plaintiff's individual capacity claims.

In conclusion, it is recommended that Defendant Winchester's motion for summary judgment as to Plaintiff's § 1983 claims in both his individual and official capacity be denied.  Defendant Winchester is entitled to summary judgment on any state law claims under the GTCA, but is not entitled to summary judgment on any state law tort claims for acting outside the "scope of employment."  He is also entitled to summary judgment on any punitive damage claims against him in his official capacity, but his motion for summary judgment as to punitive damages claims relating to Plaintiff's individual capacity claim should be denied.

### D. SUMMARY OF RECOMMENDATIONS

In summary, it is recommended that Defendant Johnson's motion for summary judgment be denied as to Plaintiff's state and federal claims against her in her individual capacity with regard to his 2007 incarcerations at GCDF.  It is recommended that summary judgment be granted with regard to Plaintiff's official capacity claims against Defendant Johnson. Plaintiff's claims against Defendant Johnson stemming from his 2005-06 incarcerations have already been dismissed as time-barred. It is further recommended that summary judgment be granted in Defendant Taylor's favor with regard to all of Plaintiff's claims.  It is recommended that Defendant Winchester's motion for summary judgment as to Plaintiff's § 1983 claims against him in both his individual and official capacity be denied. Defendant Winchester should be granted summary judgment on any state law claims under the GTCA, but summary judgment should be denied on any state law tort claims for acting outside the "scope of employment."  He is also entitled to summary judgment on any punitive damage claims against him in his official capacity, but his motion for summary judgment as to punitive damages claims relating to Plaintiff's individual capacity claim should be denied.

### **RECOMMENDATION**

For the reasons and to the extent set forth above, it is recommended that the motion for summary judgment of Defendant Taylor [Doc. No. 130] be granted, that the motion for summary judgment of Defendant Johnson [Doc. No 130] be granted in part and denied in part, and that the motion for summary judgment of Defendant Winchester [Doc. No. 131] be granted in part and denied in part. The parties are advised of their right to file an objection

to this Report and Recommendation with the Clerk of this Court by May 8, 2009, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1. The parties are further advised that failure to make timely objection to this Report and Recommendation waives their right to appellate review of both factual and legal questions contained herein. <u>Moore v. United States</u>, 950 F.2d 656 (10th Cir. 1991). This Report and Recommendation disposes of the issues referred to the undersigned Magistrate Judge in the captioned matter. If this Report and Recommendation is adopted, it is further recommended that the parties be given a specific date by which they could consent to the undersigned magistrate judge conducting all further proceedings. In the event the parties do not consent to the undersigned handling further proceedings, it is recommended that the case be placed on Judge Heaton's trial docket, an appropriate scheduling order entered and that counsel be appointed to represent Plaintiff if he so requests and if he qualifies for said appointment.

**ENTERED this 17th day of April, 2009.**

_____

DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE